Harrison COMBS, et al., Plaintiffs,

v.

Lewis K. LEISHMAN d/b/a Leishman Coal Company, a sole proprietorship, Defendant/Third–Party Plaintiff,

v.

CENTRAL OHIO COAL COMPANY, Third–Party Defendant.

Civ. A. No. 84–2094.

United States District Court, District of Columbia.

July 15, 1988.

Gary M. Ford, Groom and Nordberg, Chartered, Washington, D.C., for plaintiffs.

James A. Brodsky, Weiner, McCaffrey, Brodsky & Kaplan, P.A., Washington, D.C., for Lewis K. Leishman.

Kenneth A. Lazarus, Dickson Burton, John Hardin Young, Porter, Wright, Morris & Arthur, Washington, D.C., for Central Ohio Coal Co.

## MEMORANDUM

BRYANT, Senior District Judge.

Plaintiffs, as trustees of the United Mine Workers of America 1950 Pension Plan and 1974 Pension Plan brought this action against defendant Lewis K. Leishman, doing business as Leishman Coal Company, to collect withdrawal liability allegedly owed under the Employee Retirement Income Security Act of 1974, as amended by the Multiemployer Pension Plan Amendments Act of 1980, 29 U.S.C. §§ 1001–1461. Defendant Leishman has filed a third party action against Central Ohio Coal Company seeking indemnification and reimbursement. This matter is before the court on plaintiffs' motion for summary judgment, defendant Leishman's cross motion for summary judgment, and third party Central Ohio Coal Company's motion to dismiss.

## BACKGROUND

### A. *Statutory Framework*

This case arises under the Multiemployer Pension Plan Act Amendments of 1980 ("MPPAA"), 29 U.S.C. §§ 1381–1461 (1982 and 1986 Supp.). The MPPAA sets out a mechanism whereby employers who withdraw from a multiemployer pension plan must contribute to the plan a reasonable portion of unfunded vested employee benefits. The statutory scheme provides that as soon as practicable after an employer withdraws from a multiemployer plan, the plan is required to (1) determine the amount of the employer's withdrawal liability, (2) notify the employer of the amount of the withdrawal liability and a schedule for liability payments, and (3) collect the amount of the withdrawal liability from the employer. 29 U.S.C. §§ 1382, 1399(b)(1). The employer may ask the plan to review specific aspects of the withdrawal liability assessment within 90 days of its receipt of notice that liability has been assessed. Section 1399(b)(2)(A). The plan is then to conduct a reasonable review of the issues raised in the review request and to notify the employer of the results. Section 1399(b)(2)(B). Either party may initiate arbitration of a dispute concerning withdrawal liability within a 60 day period after the earlier of (1) the date of the plan's response to the employer's request for review, or (2) 120 days after the date of the employer's request for review. Section 1401(a)(1). The parties may jointly initiate arbitration within 180 days after the date of the plan's notice and demand for withdrawal liability. *Id.*

The employer from whom a plan has demanded withdrawal liability is required to make periodic payments on the schedule established by the plan during the pendency of a request for review or arbitration. Sections 1399(c)(2), 1401(d). If no arbitration proceeding is initiated, the amounts demanded by the plan are due and owing on the schedule established by the plan sponsor and the plan may bring an action for collection. Section 1401(b)(1).

In the event of a default, the plan may require immediate payment of the outstanding amount of the employer's liability, plus accrued interest on the total outstanding liability from the due date of the first payment that was not timely made. Section 1399(c)(5). An employer is considered to have defaulted if (1) the employer fails to make any payment when due if the failure is not cured within 60 days after receipt by employer of written notice from the plan of failure to make a timely payment or (2) upon the occurrence of an event defined in the plan's rules which indicates a substantial likelihood that an employer will

be unable to pay its withdrawal liability.[1]
*Id.*

If an action to collect withdrawal liability results in judgment in favor of the plan, the plan is entitled to an award of the unpaid contributions, interest on the unpaid contributions, an amount equal to the interest on the contributions or liquidated damages established under the plan, and reasonable attorney's fees and costs. Section 1132(g)(2).

### B. *Facts*

The facts in this case are not in dispute. Plaintiffs are the trustees of the United Mine Workers of America ("UMWA") 1950 Pension Plan and the 1974 Pension Plan ("the Plans"). Defendant Lewis K. Leishman was, at the time of the events giving rise to this action, doing business as Leishman Coal Company, a sole proprietorship engaged in mining coal by the auger mining method. In November 1973, Leishman entered into an employment agreement with the Central Ohio Coal Company ("the coal company") under which Leishman would mine coal at the company's Muskingham mine in Guernsey, Muskingham, Noble and Morgan Counties, Ohio. Pursuant to that agreement, Leishman was required to hire UMWA labor and to make regular contributions on behalf of those employees to the UMWA Welfare and Retirement Fund. The UMWA Welfare and Retirement Fund ("the Fund") was established by the UMWA and the Bituminous Coal Operators Association ("BCOA") under the Bituminous Coal Wage Agreement of 1974 and is governed by the National Coal Wage Agreement of 1978 and subsequent amendments ("the Agreements"). The Funds include the 1950 and 1974 Pension Plans of which plaintiffs are the trustees.

In August of 1980, a representative of the coal company informed defendant that its contract with the coal company was to be terminated at the close of the current projects. Defendant ceased all auger mining work for the coal company in January 1981, and at that time discontinued payments to the Fund.

Plaintiffs thereafter determined that defendant had ceased operations covered by the Agreements. By letter of March 31, 1982, plaintiffs notified defendant of their finding that Leishman had withdrawn from the Plans in the year ending June 30, 1981 and demanded payment of withdrawal liability of $222,181.39 to the 1950 Plan and $95,208.84 to the 1974 Plan. The letter also set out defendant's right to request review by the plaintiffs of their determinations. Defendant responded by letter of June 25, 1982 which requested that plaintiffs review their assessment of withdrawal liability. Plaintiffs notified defendant on July 9, 1982 that absent a request for review of specific matters related to the withdrawal liability determination, any review would be impossible.[2]

On September 10, 1982, defendant requested that plaintiffs review the assessment of withdrawal liability in light of Leishman's contention that it was a supervisory employee of the coal company, rather than an independent contractor employer, and therefore had no obligation to contribute to the Fund. Defendant also requested that the dispute be submitted to arbitration in the event that it could not be resolved by agreement between the parties. The trustees' letter of September 14, 1983 responded to each of the points raised by defendant and concluded that modification of the liability assessment was unwarranted. Plaintiffs also directed defendant to the requirement that defendant initiate arbitration. Defendant subsequently notified the trust-

---

1. A default as a result of failure to make payments does not occur until the 61st day after the last of (1) the expiration of the date for demanding plan review, (2) if the employer timely demands review, the expiration of the date for requesting arbitration, or (3) if the employer or the plan timely initiates arbitration, issuance of the arbitrator's decision. 29 C.F.R. § 2644.2(c)(1).

2. On August 20, 1982, the 1974 Plan notified defendant that a clerical error had been made in the Plan's calculations. The schedule of payments was revised but the total amount owed to the 1974 Plan remained the same.

ees that it wished to stay all proceedings related to the assessment of liability, pending disposition by the Supreme Court of a case involving the constitutionality of certain provisions of the MPPAA.[3] Plaintiffs responded that a stay was inappropriate and directed defendant to initiate arbitration within 60 days. Defendant declined to do so and by letter dated July 12, 1984, plaintiffs notified Leishman that it had forfeited its right to submit the dispute to arbitration.

This case was filed on July 13, 1984. Plaintiffs seek payment of Leishman's withdrawal liability and attorneys' fees and costs.

## ANALYSIS

Plaintiffs' primary argument in support of its motion for summary judgment is that because defendant failed to initiate arbitration within the statutorily prescribed time, whatever defenses it might have to the assessment of withdrawal liability have been waived. Defendant's cross motion for summary judgment asserts that it had ceased operations covered by the statutory scheme prior to the statute's effective date and was under no obligation to initiate arbitration. Leishman also maintains that it was a joint employer with third party defendant Central Ohio Coal Company and because the coal company continued its contribution to the pension funds, there was no withdrawal to trigger liability. Central Ohio Coal Company contests the characterization of its relationship with defendant as that of joint employer and moves for dismissal of the action against it.

### A. *Arbitration*

Plaintiffs' contention that arbitration of a dispute relating to withdrawal liability is a necessary prerequisite to court review is premised upon 29 U.S.C. § 1401(a)(1), which provides that "[a]ny dispute between an employer and the plan sponsor of a multiemployer plan concerning a determination made under sections 1381 through 1399 of this title *shall* be resolved through

arbitration." (Emphasis added.) It is firmly established that Congress' unequivocal intent was that parties submit disputed matters under the MPPAA to arbitration before resorting to the courts. *See I.A.M. National Pension Fund v. Clinton Engines Corp.*, 825 F.2d 415 (D.C.Cir.1987) and cases cited therein. This provision does not set up an absolute jurisdictional bar to the courts but instead constitutes an exhaustion of remedies requirement. *I.A.M. National Pension Fund v. Stockton Tri Industries*, 727 F.2d 1204, 1207 (D.C.Cir.1984). Judicial deference to the arbitration requirement under the MPPAA is motivated by the same policies that underscore the principle of judicial deference to administrative agencies: an expressed congressional preference of initial resolution of the dispute in a non-judicial forum, deference to an arbitrator's particular skill and knowledge in certain matters, and promotion of judicial economy by virtue of the increased chance that the dispute will be resolved at the arbitration stage. 727 F.2d at 1207–08. However, "when the reasons supporting the doctrine are found inapplicable, the doctrine should not be blindly applied." *Id.* at 1209.

This circuit has interpreted the *Stockton* analysis to mandate a "narrowly cabined" set of exceptions to the general rule of arbitrate first. *See Clinton Engines*, 825 F.2d at 417. For example, the existence of an issue of statutory interpretation alone will not justify bypassing arbitration. *Id.* at 418. Thus far, this circuit has only recognized one exception to the exhaustion requirement where "neither party presses the plea in abatement *and* the court finds that deferring a court contest while the parties repair to arbitration 'will neither lead to the application of superior expertise nor promote judicial economy.'" *Grand Union Co. v. Food Employers Labor Relations Association*, 808 F.2d 66, 70 (D.C.Cir. 1987) (quoting *Stockton*, 727 F.2d at 1210) (emphasis in original). This court, following the general principles outlined in *Stock-*

---

**3.** *Pension Benefit Guaranty Corporation v. R.A. Gray & Co.*, 467 U.S. 717, 104 S.Ct. 2709, 81 L.Ed.2d 601 (1984).

*ton* has also recognized an exception to the exhaustion requirement when exhaustion would be futile. *Connors v. Economy Building Systems, Inc.*, 651 F.Supp. 849, 852 and n. 3 (D.D.C.1986). In *Economy Building Systems*, the court declined to require initial resort to arbitration because the legal basis upon which the defense was based did not exist within the time set by statute for arbitration.

■ In the present case, the employer relies upon two defenses to withdrawal liability. Defendant's initial defense is that it was a joint employer with Central Ohio Coal Company. This claim appears to raise exactly the sort of issue Congress contemplated when it expressed its preference for initial arbitration—such a determination would clearly benefit from the arbitrator's particular expertise in "sifting the facts." *Stockton*, 727 F.2d at 1208. Defendant likewise can make no claim that he was unaware of this particular defense at the time of arbitration. Therefore, there are no considerations that would warrant relaxing the requirement that defendant raise its "joint employer" defense at arbitration before seeking recourse to the courts.

Plaintiffs argue correctly that defendant's actions did not constitute an adequate request for arbitration. Defendant was advised twice by plaintiff that it was Leishman's obligation to initiate arbitration. In a letter of September 14, 1983, the Plans advised Leishman that, while the Pension Benefit Guaranty Corporation had not yet published arbitration regulations pursuant to 29 U.S.C. § 1401(a)(2), it had approved interim use of the rules of the American Arbitration Association. In a second letter of April 19, 1984, the Plans sent Leishman a copy of arbitration rules adopted by the Plans and offered defendant an additional 60 days within which to initiate arbitration. Defendant's only reference to initiation of arbitration proceedings came in a letter of September 10, 1982 to the Plans in which Leishman's counsel noted that "[i]n the event that this matter cannot be resolved by mutual agreement ... Leishman Coal Company is hereby formally requesting that this matter be resolved through arbi-

tration as set forth in ERISA Section 4221 [29 U.S.C. § 1401]." Courts have recognized a crucial distinction between *requesting* arbitration and *initiating* arbitration; only the latter fulfills the requirement imposed by the MPPAA. *Robbins v. B & B Lines, Inc.*, 830 F.2d 648 (7th Cir.1987); *Combs v. Western Coal Corporation*, 611 F.Supp. 917 (D.D.C.1985); *Western Conference of Teamsters Pension Trust Fund v. F.C. Parsons, Inc.*, 5 E.B.C. 2277 (W.D. Wash.1984). Defendant's letter to plaintiff requesting arbitration of the disputed matters did not qualify as initiation of arbitration so as to meet the requirements of 29 U.S.C. § 1401(a). Defendant is therefore precluded from raising the "joint employer" defense before this court.

■ Defendant's second defense poses a somewhat more difficult problem. Defendant maintains that it ceased operations prior to MPPAA's effective date and therefore had no obligation to initiate arbitration. This argument is closely interwoven with the evolution of the MPPAA and as such requires a brief survey of the statute's history.

The MPPAA was signed into law on September 26, 1980. As enacted, the MPPAA imposed withdrawal liability as of April 29, 1980. In June 1984, the Supreme Court upheld the constitutionality of retroactive application of withdrawal liability to April 29, 1980. *Pension Benefit Guaranty Corporation v. R.A. Gray & Co.*, 467 U.S. 717, 104 S.Ct. 2709, 81 L.Ed.2d 601 (1984). Nonetheless, in July 1984 Congress amended the MPPAA and changed the effective date to September 26, 1980. *See* Tax Reform Act of 1984, Pub.L. No. 98–369 § 558, 98 Stat. 494, 899 (1984). At that time Congress also enacted the exception to the September 26, 1980 effective date upon which defendant in part relies. This provision provides:

(d) Special rule for certain binding agreements.—In the case of an employer who, on September 26, 1980 has a binding agreement to withdraw from a multi-employer plan, subsection (a)(1) [applying the September 26, 1980 effective date]

shall be applied by substituting December 31, 1980 for September 26, 1980.

Pub.L. 98–369, Title V, § 558(d), 98 Stat. 899, (codified as note to 29 U.S.C. § 1381).

Defendant maintains that as of August 1980 he had a binding agreement to withdraw from a multiemployer plan and that he completely withdrew from the plan within the meaning of 29 U.S.C. § 1383(a)(2) by December 31, 1980. In support of his contention that because he had withdrawn from the plan by the effective date of MPPAA he was under no obligation to initiate arbitration, defendant cites *Speckman v. Barford Chevrolet Co.*, 535 F.Supp. 488 (E.D.Mo.1982). *Speckman* involved an employer car dealership which had sold its facilities, terminated its dealership agreement, resold all of its new stock and laid off all but one of its employees prior to the April 29, 1980 deadline. In that case, the court determined that the employer was not subject to the provisions of MPPAA requiring arbitration. 535 F.Supp. at 491.

This court does not find the analysis in *Speckman* persuasive in the present case. As noted above, Congress established the arbitration requirement to enable disputants to take advantage of an arbitrator's superior expertise and to encourage non-judicial resolution of disputed matters relating to withdrawal liability. The question of when an employer has completely withdrawn within the meaning of 29 U.S.C. § 1383(a) so as to trigger liability strikes this court as precisely the kind of dispute contemplated by Congress in enacting the MPPAA's dispute resolution scheme.[4] To conclude otherwise would create a situation whereby an employer merely by unilaterally declaring itself to have withdrawn from a plan prior to the effective date could forego the arbitration step entirely. Such a conclusion is entirely inconsistent with Congress' "arbitrate first" policy. Because defendant is not exempt from arbitration by virtue of its withdrawal claim, it will be subject to arbitration unless one of

the exceptions to the exhaustion requirement applies.

■ Defendant argues that the coal company's August 1980 notice that Leishman's employment would be terminated at the end of the contract was both a "binding agreement to withdraw" under § 558(d) of the Tax Reform Act and marked the actual complete withdrawal date under § 1383(a)(2). This defense was unavailable to defendant until the MPPAA was amended to provide for effective dates sometime after August 1980. This did not occur until July 18, 1984—four days after this case was filed—when Congress amended the MPPAA to provide both the September 26, 1980 and, in certain cases, the December 31, 1980 deadlines. Because defendant relies in defense upon statutory provisions that had not been enacted at the time arbitration was required, the futility exception to exhaustion recognized by this court in *Economy Building Systems, Inc.*, 651 F.Supp. at 852, applies and defendant's failure to raise the defense at arbitration is not a bar to this court's consideration. *See also Central States Pension Fund v. 888 Corporation*, 813 F.2d 760, 674 (6th Cir. 1987).

### B. *Complete Withdrawal*

■ The final step in analysis of this aspect of defendant's defense is to determine when Leishman effected a "complete withdrawal" from the plan. A "complete withdrawal" from a multiemployer plan occurs when an employer—

(1) permanently ceases to have an obligation to contribute under the plan, or

(2) permanently ceases all covered operations under the plan

29 U.S.C. § 1383(a). Plaintiffs argue that defendant did not completely withdraw until it ceased all mining at the Muskingham site at the end of January 1981. Defendant maintains that it permanently ceased all covered operations under the plan when in August 1980, it began to "wind down" operations after being notified that the coal

---

**4.** This is particularly true where, as here, the facts surrounding the withdrawal do not admit of the relatively straightforward interpretation

that those in *Speckman* did. *See* discussion, *infra*.

company was no longer going to employ the auger mining method. Under the particular facts of this case, this court does not find defendant's argument persuasive.

In support of its position, defendant cites a series of cases beginning with *Speckman v. Barford Chevrolet Company*, 535 F.Supp. 488 (E.D.Mo.1982) which recognize that a complete withdrawal can occur when an employer ceases all covered operations even if the employer retains employees on its payroll to terminate the business.[5] These cases rely for support upon the legislative history of 29 U.S.C. § 1383(a) which notes that "a virtually complete cessation of contributions, e.g., a 98–percent reduction, that has the same effect on the plan as a complete cessation of contributions, is a complete withdrawal." H.R.Rep. No. 869, 96th Cong., 2nd Sess. *reprinted in* 1980 U.S.Code Cong. & Admin.News 2918, 2941. The case law has developed what has been characterized as a "practical approach" in determining whether there has been a complete withdrawal. *Cobb*, 584 F.Supp. at 1183. Courts generally have considered the number of employees at work during the contested period and the type of work undertaken during that time. *See e.g., Economy Building Systems*, 651 F.Supp. at 853–54. In *Speckman*, for example, the court found that a car dealership which had terminated all but one of its employees and whose remaining employee was not engaged in selling new cars had completely withdrawn from the plan. 535 F.Supp. at 491. Likewise in *Economy Building Systems*, a coal mine construction company finished work on its last construction project in August 1980, employed no covered employees the following month and only employed two of the original team of 5–15 employees during the month of October for clean-up. The court determined that the employer had completely withdrawn when it ceased "the business activity that gave rise to contributions to the plan," that is, the construction activity

which ceased in August 1980. 651 F.Supp. at 853–54, *quoting Speckman*, 535 F.Supp. at 491,

When viewed in contrast to *Speckman* and *Economy Building Systems*, it is clear that defendant in the present case did not completely withdraw from the plan until the end of January 1981. First, rather than there being a decrease in the number of hours worked by Leishman employees at the Muskingham Mine after August 1980, the plans indicate that contributions to the fund—which necessarily reflected the number of hours worked—were as follows: August 1980—$1,003.77; September 1980—$3,201.63; October 1980—$5,864.49; November 1980—$176.45; December 1980—$1,026.09; January 1981—$3,549.82. This sustained—if not increased—effort is inconsistent with the 98 percent reduction noted by Congress as an example of a virtually complete cessation of contributions and is vastly different from the reductions in workforce entailed in the cases cited by defendant. *See* cases cited at note 5. Second, during the contested time period from August 1980 to the end of January 1981, defendant was engaged in auger mining, which was the operation for which payments were being made on behalf of the employees to the Plans. This, again, is in contrast to the facts in *Speckman* and *Economy Building Systems*, where the much reduced workforce was engaged in clean-up, maintenance or specifically termination-related activity. While it may be true that in light of the termination notice received from the coal company, defendant viewed this time period as one of "winding down" the operation, the fact that auger mining activity was sustained at levels not substantially different from those of "normal" work periods means that defendant cannot be viewed as having completely withdrawn from the Plans until the end of

5. Defendant cites the following cases in support of its position: *Connors v. Economy Building Systems Inc.*, 651 F.Supp. 849 (D.D.C.1986); *ILGWU National Retirement Fund v. Weatherall Fashions, Inc.*, No. 84 Civ. 0772, slip op. (S.D.N.Y. Feb. 24, 1986); *Iron Workers Local 473 Pension Trust v. Allied Products Corp.*, 8 EBC 1959 (N.D.Ill.1986); *Textile Workers Pension Fund v. Standard Dye & Finishing*, 607 F.Supp. 570 (S.D. N.Y.1985); *F.H. Cobb Co. v. N.Y.S. Teamsters Conference*, 584 F.Supp. 1181 (N.D.N.Y.1984).

January 1981 when, by its own admission it made its final contribution.

Because the court concludes that complete withdrawal from the Plans was not accomplished until the end of January 1981, it is unnecessary to determine whether the coal company's August 1980 notification of defendant that employment would terminate with completion of the projects constituted a binding agreement so as to trigger the December 31, 1980 MPPAA effective date. Regardless of whether the December 31, 1980 or the September 26, 1980 date is applied, defendant ceased operations after the effective date and thus owes withdrawal liability.

### C. *Third Party Claims*

Defendant's third party complaint raised an action against Central Ohio Coal Company for indemnification and reimbursement of any liability defendant might owe to plaintiffs. Defendant's motion for summary judgment also requests that this court interpret the relationship between Leishman and the coal company as that of joint employers. Defendant's claims on both theories are dismissed.

 First, as discussed above, defendant is barred from raising its joint employer theory because it was not initially submitted to arbitration as required by the MPPAA. Because third party defendant's liability under that theory was premised upon a finding that this court is clearly precluded from making, defendant's third party claim on the joint employer theory is dismissed. Leishman's other claim based on the theory that the coal company was contractually obliged to indemnify Leishman must be dismissed for want of subject matter jurisdiction. As noted in the case of *Connors v. B & W Coal Company*, 646 F.Supp. 164 (D.D.C.1986), the obligation of a third party to make withdrawal liability payments is dependent upon the existence of an express contractual obligation to do so. Where the third party plaintiff has not expressly alleged the existence of such a contractual obligation, there is no valid claim that depends upon the outcome of the main case—as is required for jurisdiction to

be proper under Rule 14(a). 646 F.Supp. at 170–71. Because Leishman's claim that the coal company is liable for withdrawal liability incurred by the defendant is not supported by a contractual agreement between them, that claim is also dismissed.

### CONCLUSION

For the reasons stated above, plaintiffs' motion for summary judgment is granted, defendant's cross motion for summary judgment is denied and third party defendant's motion to dismiss is granted. In accordance with the provisions of 29 U.S.C. § 1132(g) the defendant is directed to pay the Plans the following sums:

#### 1950 Pension Plan

| | |
|---|---|
| Withdrawal liability | $222,181.39 |
| Interest (6/9/82—2/15/85) | 84,457.15 |
| Interest (2/16/85—present) at $68.43 per day | |
| Liquidated Damages | 44,436.28 |

#### 1974 Pension Plan

| | |
|---|---|
| Withdrawal liability | 95,208.84 |
| Interest (6/9/82—2/15/85) | 36,191.45 |
| Interest (2/16/85—present) at $29.32 per day | |
| Liquidated Damages | 19,041.77 |

The parties are directed to submit documentation regarding reasonable attorney's fees and costs incurred in prosecuting this case.