**DORN'S TRANSPORTATION, INC. and Oneida Motor Freight, Inc., Plaintiffs,**

v.

**TEAMSTERS PENSION TRUST FUND OF PHILADELPHIA AND VICINITY, Defendant.**

**Civ. A. No. 83–2012.**

United States District Court,
D. New Jersey.

Oct. 25, 1984.

As Amended Dec. 13, 1984.

Podvey, Sachs & Catenacci by Robert B. Gigl, Jr., Newark, N.J., and Bridgeman & Urbanczyk, Washington, D.C., for plaintiffs.

Schneider, Cohen & Solomon by Paul A. Friedman, Jersey City, N.J., for defendant.

DEBEVOISE, District Judge.

*Introduction*

This case arises out of a demand by defendant Teamsters Pension Trust Fund of Philadelphia and Vicinity (Teamsters Fund) for payment by Dorn's—now Oneida's wholly-owned subsidiary—of $315,516 which the Teamsters Fund claims as "withdrawal liability" due under the Multiemployer Pension Plan Amendments Act of 1980, 29 U.S.C. § 1381 et seq. (MPPAA).

Dorn's and Oneida now seek summary judgment on two alternative grounds: (1) that the undisputed facts show that there has been no "withdrawal" from the Teamsters Fund such as to create a statutory basis for its claim for withdrawal liability, and (2) if the statute were construed to require the payment demanded, then, on the facts of this case, it would violate the Fifth Amendment to the Federal Constitution. Since, however, this motion can be decided on statutory, rather than constitutional, grounds, the Fifth Amendment claim will not be reached.

*Statement of Facts and Procedural History*

Until March 1981, plaintiffs Dorn's Transportation, Inc. (Dorn's) and Oneida Motor Freight, Inc. (Oneida) operated separately as motor common carriers of freight over routes in the Northeastern United States. Oneida and Dorn's had no relationship to one another except as competitors until 1980, when the two began negotiating for the sale of Dorn's to Oneida. On March 2, 1981, Oneida contracted to purchase all of the outstanding stock of Dorn's for $1,035,000. At that time, Dorn's was in financial difficulty and had a negative net worth of $995,000.

On March 5, 1981, the Interstate Commerce Commission (ICC) granted temporary authority to Oneida to control and operate Dorn's business, pending disposition of Oneida's application for final authority to control Dorn's and purchase its stock. The ICC gave its final approval in an Order entered July 22, 1981. Dorn's Pennsauken, New Jersey terminal, one of nine Dorn's terminals, was shut down on March 6, 1981, the day after the ICC grant of temporary authority. Dorn's employees were told to report to the Oneida terminal in Pennsauken on the following Monday morning. Ten of the twelve Dorn's full time employees at Pennsauken, all members of the International Brotherhood of Teamsters, Chauffeurs and Warehousemen, Local 107, accepted employment with Oneida. Overall, more than 700 of the approximately 800 Teamsters members employed by Dorn's became employees at Oneida terminals. All such employees were unionized.

Prior to Oneida's purchase of Dorn's, both plaintiffs were parties to a collective bargaining agreement with Local 107 of the Teamsters which covered their Pennsauken employees. The agreement in effect in March 1981 was first effective April 1, 1979. It required each of the employers to contribute to defendant Teamsters Fund, a multiemployer pension fund, on behalf of employees who were Local 107 members.

For the year prior to March 1981, Dorn's had made pension contributions to the Teamsters Fund on behalf of approximately twelve full time Teamster employees and varying numbers of "casual" employees who were members of Local 107. Local 107 had had advance notice of the pending Oneida-Dorn's transaction and participated in a proceeding which resulted in a March 3, 1981 determination by the Teamsters' Philadelphia and Vicinity Joint Area Committee that Dorn's Pennsauken terminal employees should be "dovetailed" into

Oneida's Pennsauken terminal employees seniority list. *See* Decision of Joint Area Committee, Plaintiffs' App. at 52.

Since Oneida acquired Dorn's, plaintiffs have continued to make pension plan contributions on behalf of all Dorn's former employees now employed by Oneida. In the years following the acquisition, plaintiffs' contributions have been approximately 90% of the combined contributions made by Oneida and Dorn's separately in the five years preceding 1981.

Upon the termination of Dorn's operations, the defendant Teamsters Fund submitted a claim to Dorn's for payment of "withdrawal liability" from the fund in the amount of $315,516. Defendant made this claim under the Multiemployer Pension Plan Amendments Act of 1980 (MPPAA), 29 U.S.C. § 1381 et seq.[1]

█ The MPPAA was enacted to provide a statutory scheme under which employers who chose to terminate, or significantly reduce the levels of, their contributions to a multiemployer pension plan are liable for a proportionate share of the "unfunded vested benefit liability" of that plan. The MPPAA was intended to prevent employers from evading their obligations under collective bargaining agreements to contribute to multiemployer plans. Section 1383(a) of the MPPAA defines a complete withdrawal as follows:

A complete withdrawal from a multi-employer plan occurs when an employer—
(1) permanently ceases to have an obligation to contribute under the plan, or
(2) permanently ceases all covered operations under the plan.

Several provisions of the MPPAA create exemptions from withdrawal liability for certain types of funds and where withdrawal occurs in specified situations. Plaintiffs claim that they are not liable for withdraw-

al payments under two provisions of the MPPAA. First, § 1398 provides that:

... an employer shall not be considered to have withdrawn from a plan solely because—
(1) an employer ceases to exist by reason of—
   (A) A change in corporate structure described in § 1362(d)...
if the change causes no interruption in employer contributions or obligations to contribute under the plan...
For purposes of this part a successor parent corporation or other entity resulting from any such change shall be considered the original employer.

The changes described in § 1362(d) include:

A reorganization which involves a mere change in identity, form, or place of organization, however effected ...; a liquidation into a parent corporation [or] a merger, consolidation or division...

Thus, plaintiffs contend that Oneida's purchase of 100% of Dorn's stock and the transfer of Dorn's operations to Oneida's facilities, combined with the fact that Oneida continued to make payments to the fund for the former Dorn's employees, brings plaintiffs within the exemption provided by § 1398.

Plaintiffs also contend that, under ERISA and the MPPAA, Dorn's and Oneida are one employer, and that therefore there has been no § 1383(a) withdrawal and no consequent liability. This contention is based on a series of definitions of "employer" that appear throughout ERISA, the MPPAA and related provisions of the Internal Revenue Code. For purposes of ERISA, 29 U.S.C. § 1001 et seq., an "employer" means "any person acting directly as an employer, or indirectly in the interest of an employer, in relation to an employee bene-

---

**1.** To date, Dorn's has received three demands for payment of withdrawal liability, in addition to the Teamsters Fund's claim. The Trucking Employees of North Jersey Fund has demanded $318,959; the IAM National Pension Fund has demanded $61,346; and the Management-Labor Pension Fund, Local 1730 ILA, originally claimed $178,800, but, because that Fund later conceded that it was a "trucking industry plan", Oneida posted a bond for 50% of that amount pursuant to 29 U.S.C. § 1383(d). The aggregate amount claimed, including the Teamsters Fund's claim, is $874,621, if paid immediately or, in quarterly installments, $1,047,447. McGoldrick Aff. at ¶¶ 33, 34, Plaintiffs' App. at 8.

fit plan; and includes a group or association of employers acting for an employer in such capacity." 29 U.S.C. § 1002(5). That definition is supplemented by 29 U.S.C. § 1301(b), which states:

> For purposes of this subchapter [subchapter III], under regulations prescribed by the corporation [Pension Benefit Guaranty Corporation (PBGC)], all employees of trades or businesses (whether or not incorporated) which are under common control shall be treated as employed by a single employer and all such trades and businesses as a single employer. The regulations prescribed under the preceding sentence shall be consistent and co-extensive with regulations prescribed for similar purposes by the Secretary of Treasury under § 414(c) of Title 26.

The PBGC regulation promulgated pursuant to this section, 29 C.F.R. § 2612, incorporates by reference the provisions of § 414(c) of the Internal Revenue Code of 1954 which are in turn assimilated to the provisions of § 414(b). The latter section in turn relies upon the definition of "controlled group" in 26 U.S.C. § 1563(a). Section 1563(a), the section applicable in the circumstances of this case, defines a parent subsidiary "controlled group" as:

> One or more chains of corporations connected through stock ownership, with a common parent corporation if—
>
> A. Stock possessing at least 80% of the total combined voting power of all classes of stock entitled to vote, or at least 80% of the total value of shares of all classes of stock of each of the corporations, except the common parent corporation, is owned (within the meaning of subsection (d)) by one or more of the other corporations.
>
> B. The common parent corporations owns (within the meaning of subsection (d)(1)) stock possessing at least 80% of the total combined voting power of all classes of stock entitled to vote or at least 80% of the total value of shares of all classes of stock of at least one of the other corporations, excluding, in comput-

ing such voting power, or value, stock owned directly by such other corporations.

Since Oneida acquired the right to 100% of Dorn's stock on March 2, 1981 (the date of the contract of sale), plaintiffs claim that they have been a single employer since that date for purposes of 29 U.S.C. § 1301(b).

Defendant claims that, since, under § 1383(a) of the MPPAA, the date of withdrawal is the date that covered operations and the obligation to contribute cease, a complete withdrawal was effected by Dorn's when it shut down its Pennsauken terminal. Defendant asserts that this situation is not one falling under § 1398, and argues that the controlled group concept set forth in § 1301(b) was intended by Congress to be a collection device, and not a means by which employers can be exempted from withdrawal liability.

In addition, defendant alleges that the acquisition of Dorn's by Oneida was not a bona fide transaction, but rather was undertaken as a means of avoiding withdrawal liability. In support of this allegation, defendant points to a 1982 action in the Southern District of New York entitled *Dorn v. Dorn's Transportation, Inc. and Oneida Motor Freight, Inc.,* a decision reported at 562 F.Supp. 822 (S.D.N.Y.1983), in which Walter Dorn, a former owner of Dorn's, sought confirmation of an arbitrator's award. The matter submitted to arbitration concerned a default by Oneida on the sales contract between itself and Walter Dorn that occurred when Oneida discovered that Dorn's had had a withdrawal liability claim asserted against it. This action was dismissed for lack of subject matter jurisdiction. *Dorn v. Dorn's Transportation, Inc. and Oneida Motor Freight, Inc.,* 562 F.Supp. 822 (S.D.N.Y.1983). Defendant claims that this dispute over whether Walter Dorn had disclosed this claim for withdrawal liability calls into question the bona fide nature of the Oneida-Dorn's sale. Defendant therefore requests that the court defer its decision on this summary judgment motion so that discovery can be had on this matter.

*Discussion*

Plaintiffs' first contention is that Dorn's is exempted from withdrawal liability under § 1398 of the MPPAA since Dorn's ceased to exist by reason of a merger, and there has been substantially no interruption in contributions to defendant Teamsters Fund on behalf of the former Dorn's employees. Although defendant asserts that this situation is not one falling under § 1398, defendant fails to provide support for its assertion.

■ I find that plaintiffs are protected by the exemption provided by § 1398, since the facts of the Dorn's-Oneida transaction appear to be those contemplated by the language of that section. Dorn's ceased to exist, and ceased operations, by reason of its merger with Oneida. As of March 6, 1981, Dorn's ceased to have a corporate identity separate from Oneida's, and Oneida took over all of Dorn's operations. There was no interruption in contributions to the plan on behalf of the former Dorn's employees, and, indeed, defendant never alleged any interruption.

Defendant's assertion that § 1398 does not apply appears to be based, if, in fact, it has any basis, on defendant's assertion that the Dorn's-Oneida sale was not bona fide. Defendant has produced the entire file on the *Dorn v. Dorn's and Oneida* litigation, but I do not find that that litigation establishes grounds for an allegation that the sale was simply a means for Walter Dorn to avoid a withdrawal claim against Dorn's. Indeed, the record shows, and defendants do not dispute, that the sale was the result of protracted negotiations that began in 1980, and there is no evidence that the sale was not an arms length transaction. The withdrawal claim that was the subject of the litigation does not appear to be defendant's claim, and while the record is not clear, the claim appears to have arisen after the sale was consummated on September 17, 1981, or at least after the contract was signed on March 2, 1981. There is thus no clear indication that Walter Dorn entered the contract to avoid withdrawal liability. At most, it can be said that Walter Dorn knew that it was possible that a withdrawal claim would arise, and failed to disclose that possibility to Oneida. That is not enough, however, to support an allegation that the possibility of such a claim caused Walter Dorn to negotiate and consummate the Dorn's-Oneida sale in order to avoid withdrawal liability. Given the financial condition of Dorn's at the time of the sale, there appear to be many, more overriding, reasons why Walter Dorn wished to sell the company. The very fact that the parties to the transaction engaged in litigation concerning its implementation is further evidence, if any were needed, of its arms length nature.

Plaintiffs' next contention is that there is no withdrawal liability because Dorn's and Oneida were a single employer within the meaning of § 1301(b). Plaintiff cites three cases that discuss the meaning of the language in § 1301(b) which defines a single employer as "trades or businesses" whose employees "are under common control". Two of these cases, *PBGC v. Ouimet*, 630 F.2d 4 (1st Cir.1980) and *PBGC v. Anthony*, 537 F.Supp. 1048 (N.D.Ill.1982), concerned single, rather than multiemployer plans and involved situations in which a parent and subsidiary were found to be a single employer and both were subject to withdrawal liability under the MPPAA. The third case, *Dyck v. Southern Pacific Milling Co.*, 4 E.B.C. 1346 (C.D.Ca.1983), involved a multiemployer plan and concerned a situation where facilities were transferred from one subsidiary of a parent company to another subsidiary of the same company. The court found that there was no withdrawal liability on the grounds that the two subsidiaries were a single employer under ERISA § 1301(b)(1) and 29 C.F.R. § 2612.3. The court based its decision largely upon the fact that the employment condition of the employees at the transferred facilities was the same as before the transfer.

Plaintiffs cited these cases in support of their contention that § 1301(b) applies to all provisions of the MPPAA. Defendant, on

the other hand, argues that Congress intended § 1301(b) to be used only as a collection device where the withdrawing employer was bankrupt or had insufficient funds to cover the withdrawal liability.

The extremely limited case law in this area makes this a difficult issue to resolve. Two important factors, however, lead me to conclude that the controlled group/single employer concept does serve to protect plaintiffs from withdrawal liability, at least in situations where the number of covered employees and payments to the pension fund remain substantially unchanged. First, there is nothing in the language of § 1301(b) that suggests it is only intended as a collection device. Indeed, as the court in *Anthony, supra,* pointed out, "[b]y the unambiguous language of § 1301(b)(1), its treatment of a " 'common control' group as a 'single employer' applies for the 'purposes of this subchapter [subchapter III, encompassing the MPPAA]' ". 537 F.Supp. at 1051. The *Ouimet* court made the identical point. 630 F.2d at 10–11. *See also* PBGC General Counsel Opinion 82–13, Plaintiffs' Reply App. While those courts used the single employer concept to find withdrawal liability, the *Dyck* court used § 1301(b) to find that a "single employer" who continued contributions was not subject to withdrawal liability. It thus appears that § 1301(b) was not intended to be only a collection device.

Second, the basis of the finding of no liability in *Dyck* was that the employees remained in exactly the same position after the facilities were transferred as they were before the transfer. While the same cannot quite be said for the Dorn's-Oneida employees, those employees are in substantially the same position as they were before the sale. All Dorn's employees at the Pennsauken terminal were given the opportunity to continue employment with Oneida, and ten of the twelve employees did so; the routes they drive are substantially the same; they continue membership in the same union local; and Oneida continues to contribute to the fund in their behalf. They may not be under the same collective bargaining agreement as they had with Dorn's, but their seniority rights after the transfer were determined in a March 3, 1981 proceeding before the Teamsters Philadelphia and Vicinity Joint Area Committee. *See* Decision of Joint Area Committee, Plaintiffs' App. at 52. I thus find that, for the purposes of determining withdrawal liability, Dorn's and Oneida are a single employer within the meaning of § 1301(b), and are not liable for withdrawal payments under the MPPAA.

The MPPAA is intended to ensure that employers do not evade their obligations to multiemployer funds by withdrawing from such funds. Here, however, the beneficiaries of the fund remained in substantially the same position and contributions to the fund remained substantially the same. This does not appear to be the type of situation that Congress sought to address in enacting the MPPAA.

*Conclusion*

Plaintiffs' motion for summary judgment on the grounds that there is no statutory basis for withdrawal liability is granted. The constitutional issues raised by plaintiffs in this motion were not heard. Defendant's request for a deferred decision in order for more discovery to be had is denied.

Counsel for plaintiffs are requested to submit an appropriate form of order.